The next case on our calendar this morning is United States v. Shine, No. 20-314. Mr. Stokowski? Yes, Your Honor. Good morning. Morning. I have to get a boring sex trafficking case after that exciting argument about the tax code. I haven't listened to that kind of stuff since law school. In any event, in this particular case, in my mind, there's many issues. I believe that the government took this case and ran with it, even though they didn't have significant proof in many of the areas that were necessary under Section 1591 of the United States Code. Most particularly, I start out, and I'm going to just cover this briefly and get into the major point, that is the voluntariness and the coercion. But in this particular case, they have to demonstrate a venture. They want to rely on a case called Moss that says they can be prostitutes and co-venturers. But in that particular case, there was more to it. The co-venturer was a prostitute, but she did it for her own profit. She was handling the money herself. She was recruiting the people. There were many, many more overt acts than in this case. In this case, they want to suggest that Brittany Weand was his co-conspirator. Interestingly, I never received any notice that there was going to be any unindicted co-conspirators that were present in this case, even though they had a conspiracy count. When I do drug cases in federal court and drug conspiracies, I always get a list of unindicted co-conspirators, those co-operators and those people who are not indicted, but are part of the co-conspiracy. I say that because in the statute, it requires a venture to be a group of two or more individuals associated, whether or not an illegal entity. It has to be in furtherance of this trafficking scheme, and it has to be for profit. In this case, they want to claim that all of the victims did not profit at all from this, and all of the victims were coerced into doing it. Now, that's not what it shows. More importantly, I really strongly believe that the court should analogize that Giobardi case, although it's an old one, from the Supreme Court of the United States, where the actual wife of the person charged, Mr. Giobardi, was transported across state lines to perform acts of prostitution. In that case, they said you can't be a victim and the prostitute and co-conspirator. So, in this case, I think that that's very much analogous, and it very much goes to the essence of what the venture was. Wasn't there evidence introduced that Ms. Wieand managed the prostitutes who stayed at Shine's house, that she took photos of the woman, posted them to Backpage with a description, taught them how to use Backpage, told them how to respond to men responding to Backpage ads? She dressed the women and did their hair. Wasn't she playing a managerial role, and isn't that enough to establish a venture for a jury-defined venture? I don't think that's enough, because if you notice, there were other girls that were engaged in teaching Backpage. Backpage, back in those days, before the government put it out of business, was the place where prostitutes solicited business around the country on the Internet. I can't remember which ones are off the top of my head right now, but I think I discussed it in my brief. One or two of the others also taught girls how to put themselves on Backpage, because some of them were using Backpage when they were in the streets. Brittany Wieand was his girlfriend, much like the wife in Jabardi. Now, so for those reasons, I don't think that they proved venture, and I don't think that they proved that these girls, they can't come in and say that these girls were being exploited, and that they're making a profit from it, because that just doesn't cut it. Now, with regard to the coercion. I think Judge Robinson had a question. No, no, before you leave that point, thank you. I'm confused when you say unindicted co-conspirator. I'm looking at the superseding indictment, and Ms. Wieand is a named defendant in that superseding indictment. Isn't that very different? I'm looking at the appendix on page 1482. Oh, I don't think that, oh, I, you know, I might be wrong. Okay, sorry, that's fine. I didn't mean to press you. I didn't think she was a defendant, because I never saw her in any of the, in any of the case at all. Okay. So, Ms. Wieand was an indicted conspirator. Now, in any event, with regard to, with regard to coercion, I believe that they brought this case because they wanted to establish as a precedent in our circuit that the furnishing of drugs, or as they say, the withholding of drugs, is a coercive event. And if you look at both the Mack and the Fields case, which they rely on, we see that in those cases, there was a withholding of the drugs. There's never one person here that there was a withholding of the drugs. In one instance, he ran out of Suboxone. Suboxone is a drug that they use to treat girls that are on heroin withdrawal. So, he ran out of it, and then as soon as he got it, he gave back that, gave back the Suboxone. But none of the other ones had anything to do with it. All of these girls were gotten off Grant Street, except for two, Brittany Wieand and Kimberly Yox. Kimberly Yox had a long-term personal relationship with Mr. Schein. She was his girlfriend prior to Brittany Wieand being his girlfriend. They had a relationship, and I bring that up because there was a domestic violence incident between the two of them. And she went to the family center for domestic violence. She didn't go to the police saying, my pimp struck me because I didn't go out on a call. That's not what happened here. That's not what happened at all. There were incidents of domestic violence from time to time with his girlfriend, including Brittany Wieand. The coercive acts needed to be withholding of drugs. And that's what Fields and Max stand for. The record, and we are over time here, but the record seemed to me to support the conclusion that reached by the district court that Mr. Schein exploited the fear of homelessness, withdrawal, and violence to compel them to engage in commercial sex acts. You seem to be arguing that only if he had withheld drugs at some point, if there was specific evidence of that, could the jury have reasonably found... Each one is different. And if you look in my section, I go through each one in their testimony. The government tried to extract what they were afraid of, and they were afraid of returning to the streets. They were furnished clothes. They were furnished hairdressing, nails. They were furnished a roof over their heads. And in Jenny Del Monte's case, she even repaired her car and provided money for her car. So these girls were actually participating in this in a way that wasn't coercive and never was coercive. And there's not one scintilla of proof about Cheryl Lynn Anderson. We don't even know if she even went out on a call, or we know that she overdosed on heroin there, and that one of the other girls hit her, and Schein hit her, and then put her back out on the street. But we don't even know if she had any incidents of prostitution. Yet the jury convicted him of Cheryl Anderson without any proof whatsoever of that. Mr. Stokowski, you've reserved three minutes of rebuttal. We'll hear from the government. Okay. Thank you. Ms. Gregory. Good morning. May it please the court, Catherine Gregory, Assistant U.S. Attorney representing the United States. This court should affirm the conviction. The trial evidence in this case was more than sufficient to establish each of the sex trafficking counts, and the admission of expert testimony was well within the district court's discretion, especially where here that testimony tended to both prove an element of the offense as well as disprove the defense. Testimony from these survivors showed that Valentino Schein was a master manipulator and a sex trafficker who targeted women struggling with addiction. He looked for them at crack houses just as easily as he looked for them at Narcotics Anonymous meetings. Ms. Gregory. Yes. Ms. Gregory, I think Mr. Stokowski is arguing that there was no evidence that he threatened them with withholding drugs. In fact, the evidence showed that he just provided benefits to them, and therefore a finding of coercion is not supported. What's your answer to that? Well, I would just point to the government's brief where we break down each victim's testimony with citations to the record. But as a few examples, J.D. testified that he would, quote, dangle Suboxone when she didn't want to perform commercial sex and would only give it to her in small enough amounts to keep her from becoming dope sick because when they were in withdrawal, they could not perform sex acts for him. K.Z. also testified that the less money she made for Schein, the fewer drugs he would give her. K.Y. also explicitly testified that when she didn't want to perform these sex acts, he would withhold drugs and she would cry in her room all the time. And every single one of them said that withdrawal felt horrible, felt horrific. And those citations to those points in the testimony are throughout that portion of our brief where it breaks down each victim's testimony. So S.C., by contrast, she performed very well for Mr. Schein and she was granted virtually unlimited access to drugs. But even she wasn't allowed to be alone in the house. She wasn't allowed to be by herself. None of them were allowed to speak to men when they were with Schein. And even just the physical violence in this case, every victim testified to some pretty disturbing facts. For example, S.C. testified that Schein raped her. That's at 469 in the appendix. J.D. testified that Schein choked her and got physical with her. That's at 726-27. K.Y. testified that Schein beat her so violently that she urinated on herself. And then he poured water over her and laughed. That's at 308-310. Several of the survivors did testify as to the abuse that C.A. endured as well. Of course, her addiction claimed her life after Schein threw her out on the streets. But they were witnesses to what happened, to the violent beating that she undertook, to the back page ads that she had to post at Schein's direction. K.Y. testified to some of that. I believe S.C. may have also spoken specifically about C.A. Again, all of that is detailed in our brief. Now, I understand this ostrich approach. It never happened. They never said this. But this record could not be clearer. Exactly what Mr. Schein did to these women is just reflected at length in their testimony. So I would also like to point to K.Y.'s testimony where Schein kind of repeated this fiction about voluntariness and consent, even to his victims. So K.Y. explained to the jury. I just like a quick quote. He liked to say that like we willingly did it. But he made it so fearful to get away that there was no other choice but to do it. Because doing what I was doing, I was such an outcast in the outside world, end quote. That's at 42 to 43. I don't think it gets much clearer than that. Of course, Mr. Schein would like to believe this was voluntary. Of course, he likes to say that it's voluntary, even to his victims. But every single one of them testified as to the physical violence, the intimidation, threats of being kicked out. They even saw C.A. kicked out on the street when she displeased him. And the physical violence. Whatever these women did to survive before and after Schein's criminal conduct, whether they were sex workers or remained sex workers or became sex workers later. The issue at trial and under the statute was whether Schein used force, threats of force or coercion, which includes physical and non-physical serious harm. Knowing that it would cause these particular women to engage in commercial sex acts. And in their own words, he undeniably did. Now, finally, as to the expert testimony, just briefly. The expert testimony from Dr. Dukas and Special Agent Amo was properly admitted. The entire trial here was about voluntariness versus coercion. And the expert testimony tended to prove the element, which was the force and coercion, as well as disprove a defense. Victims testified that they were addicted, that Schein would give them drugs as long as they performed to his liking. I cited some of that earlier on in the argument. Why was Dr. Dietz's testimony really necessary? You know, he testified primarily about withdrawal symptoms that can occur if a user stops taking the drugs. Isn't that something that's kind of commonly known and within the grasp of an average juror? Did they really need expert testimony on that score? Respectfully, no, Your Honor. I mean, I hear my coworkers say they're withdrawing from caffeine sometimes when they miss their morning coffee. Lay People's understanding of withdrawal is very different, as Dr. Dietz explained, from the actual physical effects. That it's not just a mental withdrawal, that it's painful, it's debilitating. And this was a direct response to Schein's claimed defense that withdrawal symptoms weren't that bad. That the women were there voluntarily. And that, you know, it basically wasn't a big deal that these women were struggling with addiction. So this was an answer to that defense. And it was helpful for the jury in determining whether a reasonable person in the circumstances that these women faced would have been coerced. Thank you. So in this way, the expert testimony helped proving that element, disproving the defense. And in conjunction with the district court's cautionary jury instructions, the admission of this testimony was certainly within the bounds of its discretion. So unless the panel has any further questions, for all these reasons, the government submits this court should affirm the judgment. Thank you. Thank you, ma'am. Thank you. Mr. Zukoski, we'll hear rebuttal. Yes, with regard to Dr. Dietz, he never talked to anyone. He never saw if anyone had any withdrawal symptoms. He just talked generally about the physiology of drugs on a person. Isn't that what expert testimony frequently is like? It is, Judge. I've been involved with many experts and used them myself. But in this particular case, it was overly prejudicial. And if you look at the testimony, if you look at these girls, interestingly, and the government says they use them to amplify, I think they use them in lockstep with the jury. Because more than one of these girls, even though there was no withdrawal, was asked, what do you think withdrawal would be? What is the age range of the women involved in this case? I think the age range went from about 40 to 19. And they're girls? Girls, all girls. They're not women? They're girls? I'm sorry, Judge. I'm old. So am I. I understand, Judge. You know what? My brother told me 25 years ago, walking through the halls of the Capitol in Albany, I said, that's a nice looking girl. And he says, no, they're women. And I never got that in my head. Why don't you address the merits, please? Do you have anything further to say on rebuttal? Yes, I do. With regard to, there was also another expert that came in, Miss Amel. I have no idea what she was used for. She didn't even work with anyone who has withdrawal symptoms or who had withdrawal of drugs. In this particular case, to me, that's the ultimate element. If you didn't prove that these girls were withdrawing from drugs, then they didn't show coercion. And if they didn't show coercion, then they didn't meet the burden of proof. All right. Thank you very much, Mr. Stokowski. We'll reserve decision. Okay. And I'm sorry, Judge, about missing the... Try to remember. Thank you. Thank you.